[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 18, 2005
THOMAS  K. KAHN
CLERK

No. 04-14311
Non-Argument Calendar

_____

D. C. Docket No. 01-00011-CR-4-002

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MELISSA SKINNER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(April 18, 2005)**

Before BIRCH, BARKETT and FAY, Circuit Judges.

PER CURIAM:

Melissa Skinner pled guilty to conspiracy to distribute and possess with intent to distribute more than 50 grams of methamphetamine and more than 500 grams of a substance containing methamphetamine, a violation of 21 U.S.C. §§ 841(a), (b)(1)(A)(viii), and 846. She appeals her 120-month sentence, arguing that the district court erred when it disqualified her from the benefit of the safety-valve provision in U.S.S.G. § 5C1.2 by finding that she possessed a firearm in connection with the offense. For the reasons set forth more fully below, we affirm.

Skinner signed a factual statement with her plea containing the following information. A confidential informant made several purchases of methamphetamine from Skinner's codefendant and co-conspirator, Tracy Cotrell, and Skinner was present at each transaction, discussing the quality of the drugs, looking for surveillance cameras, and counting proceeds from at least one transaction. On February 12, 2001, Skinner carried a Smith & Wesson .357 revolver and 22 rounds of ammunition into a motel room, where Cotrell sold the weapon contemporaneous to a drug transaction. Both Cotrell and Skinner were arrested on March 15, 2001, and admitted to their participation in methamphetamine dealing. After conducting a Rule 11 hearing, the district court accepted Skinner's guilty plea.

The pre-sentence investigation report ("PSI") calculated a base offense level

of 32, finding that the offense involved at least 50 but less than 150 grams of methamphetamine, U.S.S.G. § 2D1.1(c)(4). A two-level enhancement was added for possession of a dangerous weapon pursuant to U.S.S.G. § 2D1.1(b)(1). Finally, Skinner received both a two-level minor-role reduction and a three-level reduction for acceptance of responsibility, for a total offense level of 29, U.S.S.G. §§ 3B1.2(b), 3E1.1(a), (b). Notably, the PSI found that Skinner did not qualify for a two-level reduction under § 2D1.1(b)(6) because she did not meet the criteria for the safety-valve provision in § 5C1.2.[1] Specifically, the PSI found that Skinner knowingly possessed and transported a firearm that Cotrell later sold, in conjunction with a drug transaction, to an individual believed to be a drug dealer, disqualifying her from the benefits of § 5C1.2.

Skinner objected to the PSI's safety-valve finding, arguing that the firearm transaction was separate from the drug offense, and thus, should not be considered in determining her eligibility under that section. To address her objection, the government called Detective Ed Cook, who worked undercover in the drug and

---

[1] U.S.S.G. § 5C1.2 allows the court to impose a sentence without regard to the statutory minimum if the defendant meets the following criteria: (1) has not more than one criminal history point; (2) did not use violence, threats of violence, or possess a firearm or other dangerous weapon in connection with the offense; (3) the offense did not result in death or serious bodily injury to anyone; (4) the defendant was not a leader or supervisor; and (5) the defendant truthfully provided all information and evidence to the government relevant to the offense. In addition, the defendant receives a two-level reduction in the offense level determined under § 2D1.1. See § 2D1.1(b)(6) ("If the defendant meets the criteria . . . of § 5C1.2 . . . decrease by 2 levels).

3

firearm transaction, to present testimony in support of its position that the firearm was connected with the drug offense. Cook testified that he worked undercover while investigating Skinner and Cotrell, and discovered through a confidential informant that Cotrell might be willing to sell a couple of handguns. On February 4, 2001, during a drug transaction with Skinner and Cotrell, Cook discussed purchasing a .357 revolver from Cotrell. Cook advised Cotrell that he could not purchase a weapon legally, wanted a firearm for protection, and "also talked about using it while hunting." Cook arranged for Cotrell to bring the firearm to their next meeting, which was on February 12.

On February 12, Cotrell and Skinner met with Cook at a motel, where Cotrell handed Cook suspected methamphetamine. At the same meeting, Skinner produced a gun case out of a backpack that she carried into the room and handed it to Cotrell, who then handed it over to Cook. The case contained a Smith & Wesson .357 and a partial box of shells. Cook then purchased the weapon and ammunition, as well as four ounces of methamphetamine. Cook further testified that Cotrell, not Skinner, consummated the sale of the gun, and that Skinner never used the firearm. He also stated that Skinner could not have handed him the gun directly from where she was sitting.

Next, the government called Drug Enforcement Agent Poore, who was in

charge of the DEA's investigation of Skinner and Cotrell. He testified that Skinner and Cotrell consented to a search of their mobile home, where agents recovered two firearms: a J.C. Higgins, Model 20, .12 gauge shotgun in a workroom and an Arminius .22 caliber eight-shot revolver, discovered in a dresser drawer that contained both men's and women's clothing. Loose ammunition was also found in various locations.

Neither the government nor Skinner presented further evidence, and the court heard argument from Skinner as to why she should be afforded the benefit of the safety-valve provisions in § 5C1.2. Skinner argued that the gun sale and the drug transaction were completely separate incidents, and the gun should not be considered under subsection § 5C1.2 as being possessed "in connection with" the drug offense. She further argued that, while the gun purchaser may have intended to use the gun to protect himself during drug dealings, Cotrell was responsible for the sale, not Skinner. Skinner argued that she was "a puppy" and a drug addict who was a tool in Cotrell's crimes. Finally, Skinner argued that, while she possessed the weapon that eventually was sold, it was for a short period of time and not part of the conspiracy to sell methamphetamine.

The government argued that Eleventh Circuit precedent placed the burden on the defendant to prove that the safety valve applies, and that Skinner clearly

possessed the firearm in question and assisted in giving that firearm and ammunition to a person she knew or believed to be a drug dealer. It further argued that Skinner knew that Cook could not obtain a gun legally, that he wanted it for protection, and that she knew, based on the previous week's dealings, that the gun was going to be sold along with the drugs. Finally, the government argued that it did not have to prove that the firearm facilitated the drug deal, but merely that Skinner possessed the firearm, and Skinner had to prove that the connection between the firearm and the drug deal was clearly improbable, which she had not done.

The court overruled Skinner's objection, and found that the issue was whether Skinner possessed the firearm or induced another person to do so. (Id. at 27). It noted that, in resolving the issue in question under § 5C1.2, other circuits had applied the light standard under guidelines section 2D1.1(b)(1), providing an enhancement if "a dangerous weapon (including a firearm) was possessed." (Id. at 28). The court found it was "very clear that having a .357 handgun in one's hand at the time of a drug transaction with ammunition right there meets" the standard for an enhancement under § 2D1.1(b)(1), and, therefore, Skinner did not qualify for a safety-valve reduction under § 5C1.2. (Id.).

However, the court further stated that its ruling did not rest on the standards

6

of § 2D1.1(b)(1) and § 5C1.2 being the same, and made additional findings that Skinner knew that Cook wanted a firearm for protection and could not obtain a firearm legally, knew that she was possessing a weapon with ammunition at the time she entered the motel room to consummate a drug transaction, and knew that the weapon was going to be sold at the moment she handed the weapon to Cotrell. Based on those findings, the court found that "it was clear . . . that they were selling a firearm to a person believed to be a drug dealer at the time of the drug transaction. By whatever standard measure, that constitutes possession of a firearm by Ms. Skinner in connection with the drug transaction." It went on to note that § 5C1.2 only requires possession, not use of the firearm, and that even if use were required, the firearm "was used to facilitate a relationship in a transaction with the drug customer."

Based on the foregoing, the court found that Skinner's PSI was accurate, and sentenced her to the statutory minimum of 120 months' imprisonment, with judgment entered on August 17, 2001. On August 2, 2002, Skinner filed a pro se motion to vacate, set aside, or correct her federal sentence under 28 U.S.C. § 2255. She argued that her counsel had been ineffective by failing to file a notice of appeal regarding downward departure issues.

Upon review, the district court granted Skinner's motion, vacated the

7

original judgment, and re-imposed an amended judgment with the exact same sentence, thus reopening the period for Skinner to file an appeal.

On appeal, Skinner argues that the district court erred by failing to consider her "intent" when it decided that she possessed a firearm "in connection with" a drug offense, thereby disqualifying her from receiving the benefits of the safety-valve provisions in § 5C1.2. Specifically, Skinner argues that the district court did not examine why she possessed the gun, and instead improperly attributed Cotrell's intent to her in making its findings. Skinner admits that her argument may be foreclosed by this Court's precedent, which holds that an individual's purpose in possessing a firearm is irrelevant, but submits that this precedent is contrary to the requirements of the guidelines, the United States Code, and the position of 10 other circuit courts.

We review for clear error the district court's factual findings that the defendant failed to meet his burden of proving that she qualified for a safety-valve reduction. See also United States v. Cruz, 106 F.3d 1553, 1557 (11th Cir. 1997). Legal interpretations of the guidelines are reviewed de novo. United States v. Johnson, 375 F.3d 1300, 1301 (11th Cir. 2004).

The "safety-valve" provision found in U.S.S.G. § 5C1.2 permits a court to sentence a defendant within the applicable guidelines range and without regard to

the statutory minimum sentences set out in 21 U.S.C. §§ 841, 844, 846, 960, or 963, if the court finds that the defendant meets all of the criteria set forth in 18 U.S.C. § 3553(f)(1)-(5). Among those criteria, and the one relevant on appeal, is that the defendant "did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense." U.S.S.G. § 5C1.2(a)(2) (emphasis supplied). The term "defendant" limits the accountability of the defendant to "his own conduct and conduct that he aided or abetted, counseled, commanded, induced, procured, or wilfully caused." Id., comment. n.4. The burden is on the defendant to prove she meets the eligibility requirements under § 5C1.2. Cruz, 106 F.3d at 1557.

The guidelines do not define what is required to prove that a firearm was possessed "in connection with" the offense for purposes of § 5C1.2, and we do not appear to have explicitly addressed the question. In United States v. Young, however, we held that the phrase "in connection with" in U.S.S.G. § 4B1.4(b)(3)(A) (armed career criminal) required only that the defendant possess a firearm during the commission of a crime of violence to warrant application of the enhancement. United States v. Young, 115 F.3d 834, 837-38 (11th Cir. 1997). In doing so, we rejected the rationale of other circuits that required the government to prove that the firearm served a purpose related to the crime, i.e., that the weapon

9

facilitated the commission of the offense.  Id. at 838; see, e.g., United States v. Wyatt, 102 F.3d 241, 247 (7th Cir. 1996) (comparing "in connection with" to "in relation to" and concluding that "in connection with" requires that a firearm serve some purpose to the felonious conduct before an enhancement is warranted under § 2K2.1(b)(5)).

In a slightly different context, we were "unable to discern any principled reason why we should follow a path of reasoning different from that marked by our decision in [Young], when attempting to arrive at the construction that should be accorded the same 'in connection with' phrase found in § 2B5.1(b)(3)," requiring an enhancement for a defendant who possessed a firearm in connection with a counterfeit currency offense.  United States v. Matos-Rodriguez, 188 F.3d 1300, 1308 (11th Cir. 1999).  Thus, we reaffirmed our decision in Young and again rejected the view of other circuits holding that the language "in connection with" required something more than mere use or possession.  Id. at 1308-09.

Likewise, in United States v. Rhind, we reiterated that the ordinary and natural meaning of the phrase "in connection with" does not require proof of facilitation, this time interpreting U.S.S.G. § 2K2.1(b)(5).[2]  United States v. Rhind, 289 F.3d 690, 695 (11th Cir. 2002).  Thus, while we have not explicitly ruled on

_____

[2] Providing for a four-level enhancement if the defendant used or possessed any firearm or ammunition in connection with another felony offense.

the meaning of the phrase "in connection with" in the context of § 5C1.2, it seems counterintuitive and inconsistent to afford the same phrase a different meaning solely because the guidelines section is different from the sections at issue in previous cases, especially where § 5C1.2 is silent on the definition.

Furthermore, as we have noted, in some instances the test for whether a firearm was possessed "in connection with" another offense doesn't matter, as the evidence would support a district court's finding under either a "facilitation" or "mere possession" approach. See United States v. Gainey, 111 F.3d 834, 837 (11th Cir. 1997) (declining to adopt an interpretation of "in connection with" as used in § 4B1.4(b)(3)(A) and finding that the district court did not clearly err under any of the prevailing interpretations).  Here, Skinner had to prove that she was eligible for the benefits of § 5C1.2 by proving that her possession of the weapon had no connection with the drug offense.  See Cruz, 106 F.3d at 1557.  To meet her burden, Skinner purports to rely on the testimony of Cook during the sentencing hearing.

Based on Cook's testimony, it was not clear error for the district court to find that Skinner possessed a firearm in connection with the drug offense.  Cook testified that Skinner was  present at a February 4, 2001, drug sale, where Cook discussed purchasing a .357 revolver from Cotrell.  Because she was present at that

11

meeting, the inference drawn by the district court was that Skinner knew that Cook could not purchase a gun legally and that he wanted the firearm for, among other things, protection. Furthermore, she knew that Cotrell and Cook had arranged for the .357 to be brought to their next meeting on February 12. At the February 12 meeting, Skinner carried a backpack and produced a .357 revolver with ammunition from that backpack and handed it to Cotrell, who was seated next to Cook at the time.

Skinner offered no testimony of her own to explain any of the events on February 4 and February 12, and thus, it cannot be said that the district court clearly erred by finding that Skinner knew that Cook wanted a firearm for protection and could not obtain a firearm legally, knew that she was possessing a weapon with ammunition at the time she entered the motel room to consummate a drug transaction, and knew that the weapon was going to be sold at the moment she handed the weapon to Cotrell. This is true even if the district court erred by equating Skinner's burden of proof under § 5C1.2 to § 2D1.1(b)(1). See, e.g., United States v. Bolka, 355 F.3d 909, 914-15 (6th Cir. 2004) (persuasively explaining that application of § 2D1.1(b)(1) does not foreclose a safety-valve reduction under § 5C1.2, but that the district court's refusal to apply one was harmless where the defendant failed to demonstrate entitlement to it, in any event).

As we have acknowledged "a similar fact pattern may on occasion give rise to two reasonable and different constructions. . . . As the Supreme Court has recognized, a trial court's choice between 'two permissible views of the evidence' is the very essence of the clear error standard of review." United States v. De Varon, 175 F.3d 930, 942 (11th Cir. 1999) (en banc). Skinner failed to offer any evidence to meet her burden of proof, and the testimony she relies upon reasonably supports the district court's conclusion that she possessed a firearm "in connection with" the offense, whether such a finding required "mere possession" (which even she admits she had) or "facilitation." The district court reasonably could have concluded that the firearm sold facilitated a relationship with a known drug dealer, or, at the very least, a known buyer, thus constituting an overt act in furtherance of the conspiracy to distribute drugs. As such, the district court did not clearly err by denying Skinner the benefit of a safety-valve reduction under § 5C1.2. Lastly, to the extent Skinner argues that the court should have considered her intent, the plain language of § 5C1.2, does not require any proof of intent, only possession of the firearm "in connection with" the offense.

Based on the foregoing, we conclude that the district court did not clearly err by finding that Skinner possessed a firearm in connection with the offense and, therefore, did not err by denying Skinner the benefit of the safety-valve provisions

13

of U.S.S.G. § 5C1.2.  We, therefore, affirm.

**AFFIRMED.**